IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


NORTH CAROLINA ALLIANCE FOR      )
TRANSPORTATION REFORM, INC.      )
and FRIENDS OF FORSYTH,          )
                                 )
            Plaintiffs,          )
                                 )
     v.                          )      1:99cv134
                                 )
UNITED STATES DEPARTMENT OF      )
TRANSPORTATION; RAY LAHOOD,      )
Secretary, United States         )
Department of Transportation;    )
FEDERAL HIGHWAY ADMINISTRATION;  )
VICTOR MENDEZ, Administrator,    )
Federal Highway Administration;  )
JOHN F. SULLIVAN, III, Division  )
Administrator, Federal Highway   )
Administration; NORTH CAROLINA   )
DEPARTMENT OF TRANSPORTATION;    )
EUGENE A. CONTI, JR., Secretary, )
North Carolina Department of     )
Transportation,                  )
                                 )
            Defendants.          )
_____)


NORTH CAROLINA ALLIANCE FOR      )
TRANSPORTATION REFORM, INC.      )
and FRIENDS OF FORSYTH,          )
                                 )
            Plaintiffs,          )
                                 )
     v.                          )      1:08cv570
                                 )
UNITED STATES DEPARTMENT OF      )
TRANSPORTATION; RAY LAHOOD,      )
Secretary, United States         )
Department of Transportation;    )
FEDERAL HIGHWAY ADMINISTRATION;  )
VICTOR MENDEZ, Administrator,    )
Federal Highway Administration;  )
JOHN F. SULLIVAN, III, Division  )
Administrator, Federal Highway   )

Administration; NORTH CAROLINA      )
DEPARTMENT OF TRANSPORTATION;       )
EUGENE A. CONTI, JR., Secretary,    )
North Carolina Department of        )
Transportation,                     )
                                    )
                Defendants.         )
_____)

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

These two related cases involve challenges to the construction of a federal highway project around the city of Winston-Salem, North Carolina.

In case 1:99cv134, this court entered an Order of Dismissal by consent of all parties on June 29, 1999 ("Order of Dismissal"), which prohibited further work on the highway project until certain enumerated actions occurred. (Doc. 21.)[1] Defendants United States Department of Transportation ("USDOT"), Ray LaHood (Secretary, USDOT), Federal Highway Administration ("FHWA"), Victor Mendez (Administrator, FHWA), and John F. Sullivan, III, (Division Administrator, FHWA) (collectively "Federal Defendants") and North Carolina Department of Transportation ("NCDOT") and Eugene A. Conti, Jr., (Secretary, NCDOT) (collectively "State Defendants" and collectively with Federal Defendants "Defendants") contend that they have

_____

[1] Unless otherwise noted, all citations to docket filings refer to the case discussed in the immediately preceding text.

satisfied the terms of the Order of Dismissal and thus move jointly to dissolve it.[2] (Doc. 122 at 2.) Plaintiffs North Carolina Alliance for Transportation Reform, Inc. ("Alliance"), a not-for-profit organization that seeks to promote the most cost-efficient transportation system in the state while preserving cultural, historical, environmental and economic quality of life, and Friends of Forsyth, a not-for-profit unincorporated association of landowners within the path of the proposed highway, whose members are also members of the Alliance (collectively with Alliance "Plaintiffs"), contest that compliance has occurred and oppose the motion. (Doc. 126.) For the reasons that follow, the court will grant Defendants' joint motion.

In case 1:08cv570, Plaintiffs again challenge further construction on the highway project. Plaintiffs now seek summary judgment principally on the grounds that the required environmental analysis fails to (1) evaluate the effect the project would have on global climate change through the production of greenhouse gases and (2) account for the impact of

---

[2] Ray LaHood became Secretary of USDOT on January 23, 2009, and is substituted for Rodney Slater in case 1:99cv134 and for Mary E. Peters in case 1:08cv570. Victor Mendez became Administrator of FHWA on July 17, 2009, and is substituted for Kenneth R. Wykle in case 1:99cv134 and for James Ray in case 1:08cv570. John F. Sullivan, III, is currently the Division Administrator of FHWA and is substituted for Nicholas L. Graf in case 1:99cv134 and for Don Voelker in case 1:08cv570. Eugene A. Conti, Jr., is the current Secretary of NCDOT and is substituted for E. Norris Tolson in case 1:99cv134 and for Lyndo Tippett in case 1:08cv570. Fed. R. Civ. P. 25(d).

two future connecting road construction projects not contained in the current project. (Doc. 21.) Plaintiffs allege that these failures constitute violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., and the North Carolina Environmental Policy Act ("NCEPA"), N.C. Gen. Stat. § 113A-1, et seq. Defendants oppose Plaintiffs' motion and seek summary judgment themselves on the grounds that the alleged omissions do not violate federal law. (Docs. 27, 30.) Federal Defendants also move to strike certain documents that Plaintiffs submitted with their motion for summary judgment (Doc. 33), which Plaintiffs naturally oppose (Doc. 35).[3] For the reasons set forth herein, the motion to strike will be denied, Plaintiffs' motion for summary judgment will be denied, and Defendants' motions for summary judgment will be granted.

## I. BACKGROUND

### A. Case 1:99cv134

In 1989, the North Carolina General Assembly created the North Carolina Highway Trust Fund, which designated seven urban areas, including Winston-Salem, around which highway loops would be constructed. N.C. Gen. Stat. § 136-175 (1999). Created from

---

[3] State Defendants further argue that the Eleventh Amendment immunizes them from suit as to Plaintiffs' NCEPA claims. However, at oral argument on March 26, 2010, on the present motions, Plaintiffs withdrew their NCEPA claims against State Defendants, noting they have a parallel NCEPA lawsuit against State Defendants pending in state court and that their NCEPA claims were either largely duplicative of, or subsumed by, their NEPA claims. Thus, State Defendants' Eleventh Amendment argument is moot.

4

that legislation were federally-funded Transportation Improvement Program ("TIP") Projects R-2247, U-2579, and U-2579A which, taken together, span 34.2 miles and are commonly known as the Winston-Salem Northern Beltway ("Northern Beltway"). Project R-2247 encompasses the western section of the Northern Beltway from U.S. 158 north to U.S. 52 in western Forsyth County, North Carolina ("Western Section"). Projects U-2579 and U-2579A comprise the eastern section of the Northern Beltway from U.S. 52 to U.S. 311 in eastern Forsyth County ("Eastern Section").

On June 24, 1992, NCDOT issued a Draft Environmental Impact Statement ("DEIS")[4] for the Western Section. On March 29, 1996, NCDOT published the Final Environmental Impact Statement ("FEIS"). On May 6, 1996, the Raleigh Division of FHWA submitted the Record of Decision ("ROD")[5] for the Western Section

---

[4] An environmental impact statement (sometimes referred to as an EIS) is "a detailed written statement as required by section 102(2)(C) of NEPA." See 40 C.F.R. § 1508.11. NEPA requires the preparation of an environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

[5] A record of decision is a "concise public record" which must (1) state what the agency decision was; (2) identify all alternatives considered by the agency in reaching its decision; and (3) state whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted. 40 C.F.R. § 1505.2. Under federal regulations, the record of decision may not be approved until at least thirty (30) days after publication of notice in the Federal Register of the filing of a final environmental impact statement with the Environmental Protection Agency. 40 C.F.R. § 1506.10(b)(2); 23 C.F.R. § 771.127(a). This thirty day period allows the public and other agencies to comment on the FEIS prior to

to the FHWA Regional Administrator, who approved it the next day. Issuance of the ROD represented the final agency action on the Western Section and completed the NEPA process. By issuing the ROD, the FHWA effectively approved the project and accepted the FEIS.

On February 18, 1999, Plaintiffs filed case 1:99cv134 in this court alleging that the Western Section FEIS violated NEPA and NCEPA and sought, among other remedies, an injunction against any further action on the project. Approximately two weeks later, the Court of Appeals for the District of Columbia Circuit decided Environmental Defense Fund v. EPA, 167 F.3d 641 (D.C. Cir. 1999). That decision struck down certain EPA regulations that permitted the Northern Beltway to remain eligible for funding despite the fact that the Forsyth County TIP had fallen out of compliance with the Clean Air Act, 42 U.S.C. § 7401 et seq. Because the D.C. Circuit has exclusive jurisdiction to review challenges to nationally applicable regulations issued under the Clean Air Act, the decision required that the NEPA process be reopened and thus effectively mooted Plaintiffs' challenge in case 1:99cv134. Accordingly, on April 15, 1999, the Division Administrator for FHWA notified NCDOT that FHWA decided to reopen the NEPA process. By doing

_____

agency approval of the proposed project. The issuance of a ROD represents final agency action on a project and equates to approval of the FEIS for the project.

so, FHWA effectively withdrew the previously issued ROD. N.C.
Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp., 151
F. Supp. 2d 661, 671 (M.D.N.C. 2001).

With the reopening of the NEPA process, Plaintiffs' action
to enjoin Defendants became moot.  Consequently, on June 21,
1999, the parties filed a joint motion for an order of
dismissal.  This court granted the joint motion on June 29,
1999, dismissing the Complaint without prejudice and finding
that the final agency action had been superseded because the
environmental analyses would have to be redone.  The Order of
Dismissal also provided the following:

> 3.  Federal defendants shall not grant any further
> approvals, enter into any contracts, or provide any
> funds relating to the acquisition of property or
> construction of the Winston-Salem Beltway (hereinafter
> "Bypass Project") until the new environmental analysis
> and documentation process has been completed, a
> conforming Long Range Transportation Plan and
> Transportation Improvement Program for the Winston-
> Salem metropolitan area have been approved, and
> federal defendants issue a new Record of Decision
> pursuant to applicable federal law for the Bypass
> Project;
>
> 4.  State defendants shall not take any irrevocable
> actions relating to construction, right-of-way
> acquisitions, or negotiations for right-of-way
> acquisitions, in furtherance of the Bypass Project
> until the conditions set forth in paragraph 3 above
> have been met . . . .

N.C. Alliance for Transp. Reform v. U.S. Dep't of Transp., No.
1:99cv134 (M.D.N.C. June 29, 1999) (Order of Dismissal).

Subsequently, this court awarded Plaintiffs attorneys' fees as prevailing parties, finding that Defendants' failure to analyze the Eastern Section and Western Section of the Northern Beltway together in one environmental impact statement violated NEPA. N.C. Alliance, 151 F. Supp. 2d at 676-78. This court also found that Federal Defendants acted in bad faith by approving the ROD after only a one-day review.[6] Id. at 676.

**B. Case 1:08cv570**

Defendants returned to the drawing board, and in March 2004 they published a revised notice of intent to prepare an environmental impact statement for the combined Western Section and Eastern Section of the Northern Beltway and solicited public comments. A number of public meetings were held to solicit input on the range of alternatives to be considered. On October 1, 2004, Defendants published a Supplemental FEIS for the Western Section and a Supplemental DEIS for the Eastern Section. A conforming Long Range Transportation Plan ("LRTP") for the Winston-Salem metropolitan area, which includes the Northern Beltway, was approved by the Winston-Salem Urban Area Metropolitan Planning Organization ("MPO") on January 19, 2006, and by USDOT on April 5, 2006. (Doc. 123 (case 1:99cv134) Ex.

---

[6] Although the court found that Plaintiffs met the state substantive law requirements for fees against State Defendants, it left for another day whether the Eleventh Amendment barred any award in the federal action. Id. at 700.

A, Declaration of John Sullivan, P.E. ("Sullivan Decl."), ¶¶ 9, 11; see id. Ex. B, Affidavit of Michael S. Bruff, P.E. ("Bruff Aff."), ¶¶ 8, 10.) A conforming Metropolitan TIP for the Winston-Salem metropolitan area, which includes the Northern Beltway, was approved by the Winston-Salem Urban Area MPO on March 29, 2007, and by USDOT on June 29, 2007. (Sullivan Decl. ¶¶ 10, 11; see Bruff Aff. ¶¶ 9, 10.)

On January 11, 2007, after considering the public comments it received on the DEIS for the Eastern Section, Defendants issued a Supplemental FEIS/FEIS for the entire Northern Beltway ("SFEIS/FEIS").[7] The SFEIS/FEIS is comprised of three volumes containing over 1,700 pages and analyzed the proposed Northern Beltway's direct, indirect, and cumulative environmental effects on affected resources, including air quality, water quality, utilities and infrastructure, cultural resources, visual impacts, noise, hazardous materials, soils, and wildlife. Just over one year later, on February 15, 2008, FHWA signed the ROD[8] authorizing the Northern Beltway. In all, the administrative record related to the Northern Beltway comprises more than 32,000 pages.

---

[7] The SFEIS/FEIS is found in the Administrative Record ("AR") at 27419 through 29179. For ease of reference, the court will cite to the SFEIS/FEIS and its internal numbering wherever possible.

[8] The 2008 ROD is found at AR 29811 through 29978. Hereafter, too, the court will cite to the 2008 ROD and its internal numbering wherever possible.

On August 13, 2008, Plaintiffs filed case 1:08cv570 in this court, alleging that the Northern Beltway SFEIS/FEIS violates NEPA and NCEPA because it fails to evaluate greenhouse gas emissions and lacks consideration of proposed highway projects for a southern beltway loop ("Southern Loop") and a connector to the Piedmont Triad International Airport ("Airport Connector"). On June 1, 2009, Plaintiffs filed a motion for summary judgment. (Doc. 19.) Federal and State Defendants each filed an opposition to Plaintiff's motion and a cross-motion for summary judgment on July 8, 2009. (Docs. 27, 30.) Additionally, Federal Defendants seek to strike certain documents Plaintiffs filed with their motion for summary judgment as appendices on the grounds they improperly expand the record (Doc. 32); Plaintiffs have filed an opposition (Doc. 34). Briefing was completed September 2009, and the court heard oral argument on all motions on March 26, 2010.

All motions before the court are considered below.

## II. ANALYSIS

The merits of whether or not to build the Northern Beltway are not before the court; rather, the court's inquiry is limited to whether Defendants have complied with NEPA. Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677, 680 (9th Cir. 2000) (noting that "[w]e need not agree with the agency's conclusions; we must approve the EIS if we are

satisfied that the EIS process fostered informed decision-making and public participation") (internal citation omitted)).

NEPA sets a national policy of protecting and promoting environmental quality. <u>See</u> 42 U.S.C. §§ 4321, 4331(a). Its purposes are two-fold: "to ensure that agencies will carefully consider detailed information concerning significant environmental impacts and to guarantee that the relevant information will be made available to the public." <u>N.C. Alliance</u>, 151 F. Supp. 2d at 678. NEPA requires that an agency issue an environmental impact statement, which must discuss the following:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C); <u>see</u> <u>Hughes River Watershed Conservancy v. Glickman</u>, 81 F.3d 437, 443 (4th Cir. 1996) ("<u>Hughes River/Glickman</u>"). NEPA does not mandate any particular substantive result. 81 F.3d at 443. Rather, it focuses on procedure and "requires that an agency take a 'hard look' at the

environmental consequences of a proposed action, not that the agency select the most environmentally benign alternative." N.C. Alliance, 151 F. Supp. 2d at 678.

To implement NEPA's provisions, Congress created the Council on Environmental Quality ("CEQ"), which in turn promulgated implementing regulations. See 40 C.F.R. §§ 1501.1-1508.28. CEQ regulations "are binding on all federal agencies, and CEQ's interpretation of NEPA is entitled to substantial deference." Sugarloaf Citizens Ass'n v. Fed. Energy Regulatory Comm'n, 959 F.2d 508, 512 n.3 (4th Cir. 1992) (citing Andrus v. Sierra Club, 442 U.S. 347, 358 (1979)).

NEPA contains no independent private right of action, but final agency actions are subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706; Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990). The court's scope of review is to determine whether the challenged agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or whether the agency undertook action "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). In other words, the court's role is to assess whether the agency's decision is "within the bounds of reasoned decisionmaking." Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983). The court must base its decision on the administrative

record and "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." Fla. Power & Light Co. v. Lorion*,* 470 U.S. 729, 744 (1985).

Deference to agency expertise does not "shield [an agency] from a thorough, probing, in-depth review," however. Citizens to Preserve Overton Park, Inc. v. Volpe*,* 401 U.S. 402, 415 (1971), abrogated on other grounds, Califano v. Sanders, 430 U.S. 99 (1977). An agency violates the APA if it relied upon "factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Hughes River Watershed Conservancy v. Johnson*,* 165 F.3d 283, 287–88 (4th Cir. 1999) ("Hughes River/Johnson"). A court must decide if the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Va. Agric. Growers Ass'n, Inc. v. Donovan*,* 774 F.2d 89, 93 (4th Cir. 1985) (quoting Overton Park*,* 401 U.S. at 416). While the inquiry "is to be searching and careful, the ultimate standard of review is a narrow one" such that the court cannot substitute "its judgment for that of the agency." Id. "Deference is due where the agency has examined

the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." Ohio Valley Envtl. Coalition v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009) (internal quotations omitted).

### A. Case 1:99cv134: Motion to Dissolve Order of Dismissal

Defendants first seek dissolution of the Order of Dismissal in case 1:99cv134. More accurately, they seek to dissolve that portion which enjoined them from taking any further action relating to the Winston-Salem Beltway until "the new environmental analysis and documentation process has been completed, a conforming Long Range Transportation Plan and Transportation Improvement Program for the Winston-Salem metropolitan area have been approved, and federal defendants issue a new Record of Decision pursuant to applicable federal law for the Bypass Project." (Doc. 21.) Defendants contend that these conditions have been met (Doc. 122 at 2-3) and that compliance has eliminated any "case or controversy" within the meaning of Article III, section 2, of the Constitution, consequently divesting this court of jurisdiction to enforce the injunction any further. (Id. at 3.)

Plaintiffs oppose this request for relief, asserting that Defendants have not complied with the terms of the injunction. Specifically, Plaintiffs contend that the new environmental

analysis -- the SFEIS/FEIS -- contains a "seriously flawed safety analysis" that renders the ROD not issued in accordance with NEPA and thus not "pursuant to applicable law." (Doc. 126 at 2.) Defendants respond that the injunction requires only reissuance of the environmental documentation and does not contemplate substantive compliance with the environmental laws and, even if it did, the documentation passes muster under NEPA. (Doc. 132.)

Defendants have not identified any specific legal basis for their motion, other than the terms of the Order of Dismissal. The Order of Dismissal appears not to be a final order insofar as it dismissed the complaint in case 1:99cv134, but not the action, without prejudice. See Chao v. Rivendell Woods, Inc., 415 F.3d 342, 345 (4th Cir. 2005) (distinguishing between an order dismissing an action without prejudice and one dismissing a complaint without prejudice, stating that the latter order is generally not appealable); Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1067 (4th Cir. 1993) (holding that "a plaintiff may not appeal the dismissal of his complaint without prejudice unless the grounds for dismissal clearly indicate that 'no amendment [in the complaint] could cure the defects in the plaintiff's case'"). It is undeniable that the court has the inherent authority to consider and alter its non-final orders. Moses H. Cone Mem'l Hosp. v. Mercury Constr.

_Corp._, 460 U.S. 1, 12 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"); _Fayetteville Investors v. Commercial Builders, Inc._, 936 F.2d 1462, 1469 (4th Cir. 1991) (concluding that "[a]n interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment"); Fed. R. Civ. P. 54(b) (providing that interlocutory orders that resolve fewer than all claims "may be revised at any time before the entry of [final] judgment"). In this respect, the court would not appear to be bound by the dictates of Federal Rule of Civil Procedure 60(b), which authorizes the court to provide relief from "a final judgment, order, or proceeding" under certain conditions. See Fed. R. Civ. P. 60(b).

The injunctive provisions of the Order of Dismissal, however, do not fall neatly into the category of interlocutory orders. Unlike interlocutory orders that are in effect during the pendency of the action, the injunctive provisions extend beyond the dismissal of the complaint (albeit without prejudice) and proscribe further activity indefinitely into the future. Indeed, in this case those proscriptions have operated continuously for over a decade. To this end, they operate more like a consent decree. It is not surprising, therefore, that when the parties have reached agreement in the past that Defendants could engage in certain limited activity despite the

16

proscriptions of the Order of Dismissal, they have styled their consent requests as seeking relief from judgment under Rule 60(b). (<u>See</u>, <u>e.g.</u>, Docs. 31-43.)

While "[a]n injunction prohibiting a federal project until the filing of an impact statement does not precisely fit the models to which . . . Rule 60(b)(5) [is] directed," <u>Sierra Club v. Mason</u>, 365 F. Supp. 47, 49 (D. Conn. 1973) (applying Rule 60(b)), the court finds that the rule provides the appropriate framework within which to assess the question before it. When the court raised this issue at oral argument, the parties agreed that analysis under Rule 60(b) would be appropriate.

Under Rule 60(b), a party may be afforded relief from an injunction that "has been satisfied" or where prospective application of the order is "no longer equitable." Fed. R. Civ. P. 60(b)(5); <u>Thompson v. U.S. Dep't of Hous. & Urban Dev.</u>, 404 F.3d 821, 826 (4th Cir. 2005) (stating that "[t]he court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5)"); <u>Transp., Inc. v. Mayflower Servs., Inc.</u>, 769 F.2d 952, 954 (4th Cir. 1985) (per curiam) (stating that "[d]istrict courts have inherent equitable power to modify their injunctions to ensure that any injunctive relief granted fully vindicates the rights accorded by the underlying judgment"). Rule 60(b) motions are committed to the sound discretion of the trial court. <u>Nat'l Org. for</u>

17

<u>Women v. Operation Rescue</u>, 47 F.3d 667, 669 (4th Cir. 1995) (per curiam).

Before consideration of the merits, a Rule 60(b) movant must generally satisfy three threshold conditions: (1) timeliness of the motion, (2) existence of a meritorious claim or defense, and (3) absence of unfair prejudice to the opposing party. <u>Park Corp. v. Lexington Ins. Co.</u>, 812 F.2d 894, 896 (4th Cir. 1987). Defendants meet these threshold requirements. First, as to timing, their motion was filed on Feb. 19, 2009 (Doc. 122), just four days after the signing of the ROD that approved the SFEIS/FEIS issued on Jan. 11, 2007. <u>See</u> Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time . . . ."). Second, Defendants have offered facts to support their claim that the conditions of the injunction -- namely, the issuance of environmental analysis and a new ROD -- have been satisfied and, as such, the injunction should be lifted. <u>See</u> <u>Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.</u>, 843 F.2d 808, 812 (4th Cir. 1988) (noting that "[a] meritorious defense requires a proffer of evidence which would permit a finding for the . . . party"). Third, while "[t]he prejudice factor is of lesser importance," <u>Nat'l Credit Union Admin. Bd. v. Gray</u>, 1 F.3d 262, 265 (4th Cir. 1993) (citing <u>Compton v. Alton Steamship Co.</u>, 608 F.2d 96, 102 (4th Cir. 1979)), dissolution of the injunction would not

unfairly prejudice Plaintiffs because they could -- and actually did -- file another lawsuit challenging the SFEIS/FEIS and current ROD.

Having found those threshold conditions satisfied, the court turns to consideration of the merits.

### 1. Satisfaction of the Order of Dismissal

Under Rule 60(b)(5), the court may relieve a party of the obligations of an injunction where its conditions have been satisfied. Defendants contend that satisfaction requires that they have engaged in the procedural steps of conducting the necessary environmental analysis, obtained an approved LRTP and TIP, issued a SFEIS/FEIS, and adopted a ROD -- all of which they have done. Defendants contend therefore that the court lacks jurisdiction to review the SFEIS/FEIS and ROD to determine their compliance with federal law, including NEPA. Plaintiffs contend that this is a misreading of the Order of Dismissal, whose terms requiring that the ROD be issued "pursuant to applicable federal law" mandate that this court examine Plaintiffs' additional challenges to its safety analysis under NEPA.

The court concludes that Plaintiffs read too much into the Order of Dismissal. While the Order of Dismissal was entered by a judge other than the undersigned, consideration of the events leading to its entry convinces the court that the injunctive provisions were not intended to remain in effect until entry of

19

another judicial decree that considered new, not yet brought, challenges to the subsequent ROD. After Plaintiffs brought their case in 1999, Defendants agreed before even filing an answer to "reopen the NEPA process" and "effectively withdrew the previously issued ROD." N.C. Alliance, 151 F. Supp. 2d at 671. Though no party could point the court to any filing or document that shed any light on the parties' intentions in seeking the Order of Dismissal, it is noteworthy that Judge Bullock specifically cited FHWA's instructions to NCDOT in acknowledging the events precipitating the Order of Dismissal and Defendants' decision to reopen the NEPA process. FHWA stated:

> we will not grant further approvals on the Winston-Salem Bypass project until after we have completed any new or supplemental environmental analysis and documentation; the Bypass project has come from a currently conforming LRTP and TIP for the Winston-Salem metropolitan area; and we have made a new final decision to proceed with the project.

N.C. Alliance, 151 F. Supp. 2d at 672. This language tracks nearly identically that found in the Order of Dismissal and clearly conditions future project approvals on the issuance of the ROD (and not on resolution of any subsequent challenges to it). In the Order of Dismissal, the court further found that "the final agency action which was challenged in this case had been superseded" and dismissed the complaint without prejudice. (Doc. 21.) Therefore, there is no complaint before the court,

20

although the Order of Dismissal left Plaintiffs free to re-file their complaint to bring new challenges to the new ROD.  Instead of doing so, Plaintiffs chose to file a new complaint in the related case of 1:08cv570.

Other courts have likewise indicated that plaintiffs must institute separate proceedings to challenge the adequacy of the environmental documents filed in response to an injunction.  See Hunt v. N.C. Dep't of Transp., 299 F. Supp. 2d 529, 532 (E.D.N.C. 2004) (noting in NEPA case that the court "entered an order dissolving the injunction, with the understanding that plaintiffs would be allowed to file a new suit and challenge the 'adequacy' of the [new] EIS"); see also Minn. Pub. Interest Research Group v. Butz, 498 F.2d 1314, 1325 n.32 (8th Cir. 1974) (finding the injunction would terminate "upon the filing of the final EIS" and that "[a]ny challenge to the adequacy of the final EIS will require institution of a separate proceeding"); Morgan v. U.S. Postal Serv., 405 F. Supp. 413, 426 n.16 (W.D. Mo. 1975) (finding that temporary restraining order against construction "will terminate when a final EIS is filed by the [Postal] Service" and that "[c]hallenges to the adequacy of the EIS must be made in a separate suit").

The Order of Dismissal requires that a "new environmental analysis and documentation process be completed" and that Defendants "issue a new Record of Decision pursuant to

21

applicable federal law." The reference to "pursuant to applicable federal law" does not contemplate retention of jurisdiction to consider further challenges in the absence of a new complaint. Where that retention is intended, courts have so stated. See, e.g., Nat'l Audubon Soc'y v. Butler, 160 F. Supp. 2d 1180, 1191 (W.D. Wash. 2001) (ordering that the court will "retain jurisdiction to dissolve the injunction upon a showing the defendants have prepared an adequate EIS"). Nor does the injunction require that it remain in place until "adequate" documentation has been prepared. Cf. N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 887, 889-90 (9th Cir. 1992) (enjoining mining operations "until adequate environmental impact statements [were] prepared"); Sierra Club v. Callaway, 499 F.2d 982, 994 (5th Cir. 1974) (ordering that the injunction "will continue in force pending the determination of the sufficiency of the respective [environmental] statements"). Rather, the court and parties intended that a wholly new ROD would be issued, which would include NEPA analyses for the Eastern Section -- a section that was not part of the final agency action in case 1:99cv134. Indeed, the challenge Plaintiffs now raise (the safety analysis) relates to the Eastern Section, which was not the basis of the dismissed complaint but is part of a separate, subsequent lawsuit -- case 1:08cv570.

Plaintiffs rely on Public Service Co. of Colorado v. Batt, 67 F.3d 234 (9th Cir. 1995), for the contention that the court intended to retain jurisdiction and require the injunction to remain in place until any further challenges to the new ROD have been resolved. Batt is readily distinguishable, however, because there the injunction expressly provided that it would remain in place until "the comprehensive environmental impact statement is completed, reviewed, and any challenges to the statement are resolved." Id. at 235. The injunction also expressly retained jurisdiction to resolve disputes "regarding the adequacy of the final environmental impact statement." Id. The Order of Dismissal contains no such terms.

Ordinarily, the proper remedy for Plaintiffs would have been to have filed a new complaint in case 1:99cv134 (putting Defendants on notice of their claims) or including their safety analysis claims in case 1:08cv570. For some unexplained reason, Plaintiffs did neither. But because the court concludes that Plaintiffs' safety analysis arguments lack merit, and considering the need for judicial efficiency given the length of time since the onset of litigation over the Northern Beltway, the court will address, on an alternative ground, the arguments raised by Plaintiffs on the merits. Cf. Habitat Educ. Ctr., Inc. v. Kimbrell, 250 F.R.D. 397, 401 (E.D. Wis. 2008) (noting that "[t]o require plaintiffs to file new suits under these

23

circumstances would engender multiplicitous litigation and make little sense").

NEPA requires federal agencies to carefully consider all significant environmental impacts of a proposed action. <u>See Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989); <u>Nat'l Audubon Soc'y v. Dep't of the Navy</u>, 422 F.3d 174, 184 (4th Cir. 2005). An impact or effect includes "ecological..., aesthetic, historic, cultural, economic, social, or health" implications. 40 C.F.R. § 1508.8. These factors encompass public safety considered. <u>S. Trenton Residents Against 29 v. Fed. Highway Admin.</u>, 176 F.3d 658, 666-67 (3d Cir. 1999).

In opposing Defendants' motion to dissolve the Order of Dismissal, Plaintiffs argue that the SFEIS/FEIS, which justified the Eastern Section in part on safety considerations, contains a "seriously flawed" crash analysis in Table 1-12, and that the analysis was revised but "not entirely corrected" in the ROD. (Doc. 127 at 7.) Plaintiffs contend that by signing off on the changed table in the ROD, Defendants based the ROD on a "flawed SFEIS/FEIS" that violated NEPA. (<u>Id.</u> at 8.) Defendants concede that the analysis of Table 1-12 in the SFEIS/FEIS contained errors but argue that, in response to comments received, they were corrected in the ROD before it was approved and nevertheless did not constitute a significant change so as to

24

require a supplemental environmental impact statement. (Doc. 132 at 5-10.)

NEPA requires an agency to take a hard look at the environmental consequences of its proposed action even after an environmental impact statement is prepared. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 373-74 (1989). Generally, "an agency takes a sufficient hard look when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." Hughes River/Johnson, 165 F.3d at 288. An agency must supplement a draft or final environmental impact statement where it "makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i) & (ii). Thus, an agency need not supplement an otherwise finalized environmental impact statement each time new information comes to light. Marsh, 490 U.S. at 373. Rather, it "should apply a 'rule of reason'" regarding the value of the new information to the decision-making process. Id. at 373-74.

The court "must take a holistic view of what the agency has done to assess environmental impact" and not look "for any

deficiency, no matter how minor." <u>Nat'l Audobon</u>, 422 F.3d at
186. Otherwise, "[a]llowing courts to seize upon any trivial
inadequacy in an EIS as reason to reject an agency decision
would permit undue intrusion into an agency's decisionmaking
authority." <u>Id.</u> In order to trigger the supplementation
requirement "the new circumstance must present a *seriously*
different picture of the environmental impact of the proposed
project from what was previously envisioned." <u>Hickory
Neighborhood Def. League v. Skinner</u>, 893 F.2d 58, 63 (4th Cir.
1990) (emphasis in original) (quoting <u>Sierra Club v. Froehlke</u>,
816 F.2d 205, 210 (5th Cir. 1987)); see <u>Marsh</u>, 490 U.S. at 374
(providing that supplementation is required where "new
information is sufficient to show that the remaining action will
'affec[t] the quality of the human environment' in a significant
manner or to a significant extent not already considered").
Thus, the court's inquiry is two-fold: whether the agency took a
hard look at the new information and, if so, whether its
decision not to prepare a supplemental environmental impact
statement was arbitrary or capricious. <u>Hughes River/Glickman</u>,
81 F.3d at 443; <u>N.C. Alliance</u>, 151 F. Supp. 2d at 698-99.

Table 1-12 provides accident data for the years 1999-2002
for thirteen road segments in the study area for the Eastern
Section of the Northern Beltway. (SFEIS/FEIS, vol. 1, at 1-46.)
In order to determine if the roadways in the study areas sustain

a higher than average accident rate, the total accident rate for each roadway segment in Table 1-12 was compared to a calculated "critical crash rate" for each roadway segment. (Id. at 1-43.) The critical crash rate was calculated using a formula that considers the statewide crash rate, vehicle exposure, and a probability constant. (Id. at 1-47.) Safety ratios were then calculated by "dividing the total accident rate for the roadways by the critical crash rates." (Id. at 1-43.) Defendants state, and Plaintiffs do not dispute, that "[s]afety ratios over 1.00 indicate the roadway accident rate exceeds the critical rate for that type of facility." (Id.) Thus, the critical crash rate is a statistical tool that helps analyze whether a segment's actual crash rate is higher than its critical rate and, if so, identifies the possibility that the location may have a safety deficiency that could be examined further. (Id. at 1-47.) The critical crash rate was calculated only for the Eastern Section "since safety is part of the Eastern Section purpose and need." (Id. at 1-43.)

Table 1-12 in the SFEIS/FEIS denoted six of thirteen road segments with a safety ratio greater than 1.00 (two segments of U.S. 52, one segment of U.S. 311, and three segments of N.C. 66).[9] (Id. at 1-46.) After considering Plaintiffs' comments on

---

[9]  Though Defendants cite to seven road segments in the SFEIS/FEIS with a safety ratio greater than 1.00 (Doc. 134 ¶ 19), they erroneously

a range of issues (ROD at 54-55), Defendants conceded two errors. First, the vehicle exposure variable (denoted "M," which is a measure of the miles driven on the segment) in the critical crash rate formula was incorrect. (ROD at 63.) The error stemmed from the use of an average, instead of weighted, "average daily traffic" ("ADT") calculation. (Doc. 134, Affidavit of J. Kevin Lacy, P.E., C.P.M. ("Lacy Aff."), ¶ 15.) NCDOT prefers a weighted average because it takes into account the total roadway distance and the appropriate distance between the measuring sites. (Id.) The correction and reason were noted in the ROD and resulted in a quantitative decrease in many of the safety ratios. (See ROD at 54, 65.) Second, the SFEIS/FEIS used an incorrect ADT value for two segments in Table 1-12 (U.S. 311 between I-40 and N.C. 66, and U.S. 158 between U.S. 421/I-40 Business and N.C. 66). (Lacy Aff. ¶ 16.) This correction was noted in the ROD as well. (Id. at 63, 65.) As a result of these corrections, the number of Eastern Section segments with a safety ratio greater than 1.00 remained constant: 6 of 13 calculated in Table 1-12 in the SFEIS/FEIS and 6 of 13 as published in the ROD. (Compare SFEIS/FEIS, vol. 1 at 1-46 with ROD at 65.)

_____

include one segment of U.S. 311 (from N.C. 66 to Williston Road) that has a safety ratio of exactly 1.00. (SFEIS/FEIS, vol. 1 at 1-46.) Because this segment is only 1.01 miles long, its inclusion or exclusion would not appear to materially affect the outcome of the analysis.

Plaintiffs argue first that Defendants' Table 1-12 in the ROD "significantly lowered twelve of the thirteen safety ratios given in the SFEIS/FEIS" Table 1-12. (Doc. 126 at 2 n.2.) Because these changes were made in the ROD and well after the SFEIS/FEIS was issued, Plaintiffs maintain, Defendants violated NEPA's requirement that an environmental impact statement be prepared before a decision. See Sierra Club v. Peterson, 717 F.2d 1409, 1414 (D.C. Cir. 1983) (noting that an environmental impact statement is a decisionmaking tool and that "the appropriate time for preparing [it] is prior to a decision" (emphasis in original)).

While it is true that twelve of the thirteen safety ratios were lowered as a result of Defendants' corrections, nowhere do Plaintiffs offer any evidence that the changes were in fact significant in an engineering or statistical sense. Defendants, on the other hand, have presented evidence that they are not. Mr. Lacy, a thirteen-year employee of NCDOT and manager of its Traffic Engineering and Safety Systems Branch, testified in his affidavit as follows:

> The safety ratio is best thought of as a yes or no question: is the ratio higher than one? If yes, then something other than chance is likely contributing to crashes. While the ratio is rounded to two decimal places in Table 1-12, it is actually not materially important that the exact value of the safety ratio is, i.e. whether the safety ratio is 1.6 or 1.45. Instead, what matters for purposes of our analysis is whether the safety ratio is greater than one.

29

(Lacy Aff. ¶ 18.)  While all safety ratios were reduced (in several cases by mere hundredths of points), only one segment no longer remained greater than 1.00 (the 7.87 mile segment of U.S. 311 between I-40 and N.C. 66), and one segment (the 5.46 mile segment of U.S. 158 between U.S. 421/I-40 and N.C. 66) *rose* from .42 to 1.3.  (ROD at 65.)  Defendants also submitted the declaration of Mr. Joseph Geigle, a traffic operations and safety engineer for FHWA, who opined that the errors in the SFEIS/FEIS that were corrected in the ROD were not considered to be significant by FHWA under NEPA and were disclosed and corrected in the ROD.[10]  (Doc. 135.)

The record indicates, moreover, that FHWA in fact reviewed and considered these corrections to the SFEIS/FEIS before issuing the ROD, its formal agency action.  The corrections were specifically discussed in the ROD, and a corrected Table 1-12 was presented.  Immediately above the signature line of the ROD is a statement that FHWA independently evaluated the comments to the SFEIS/FEIS "along with revisions to the document."  (ROD at 92.)  Thus, the final environmental impact statement was in fact prepared and considered (with corrections based in part on public comment) before the agency rendered its decision.  The

---

[10]  While the decision of significance under NEPA is ultimately for the court and not FHWA, it is noteworthy that Mr. Lacy represents that the mistakes in the SFEIS/FEIS Table 1-12 were "innocent errors" (Lacy Aff. ¶ 21) and that no one has suggested that they were purposeful. Cf. N.C. Alliance, 151 F. Supp. 2d at 688.

record therefore demonstrates that the agency took a hard look at the comments and made corrections to its analysis. The court cannot say that the corrections presented a "seriously different picture" of the environmental impact of the proposed project from that previously presented in the SFEIS/FEIS. Consequently, the agency's decision not to issue a supplemental environmental impact statement based on these corrections was not "a clear error in judgment" so as to render it arbitrary or capricious. Marsh, 490 U.S. at 378.

Plaintiffs' argument as to the significance of the corrections is rebutted, moreover, by their own analysis. Plaintiffs contend that, despite Defendants' corrections, the safety analysis remains incorrect. (Doc. 127 at 7.) In support of their claims, Plaintiffs submitted the declaration of David Robertson, P.E., a retired NCDOT employee. (Doc. 126, Ex. 3, Declaration of David W. Robertson, P.E. ("Robertson Decl.").) Mr. Robertson testified that he recalculated various portions of Table 1-12 "using NCDOT Traffic Engineering Accident Analysis System Guidelines for Utilizing Statewide Crash Rates." (Robertson Decl. ¶¶ 5-7.) Although he did not attach the guidelines or explain further what he did, it is apparent that he calculated, among other things, a "corrected" critical crash rate and safety ratio in a "corrected" Table 1-12 (as compared to that in the SFEIS/FEIS, but not in the ROD) which he offers

31

as "my version of Table 1-12." (See id. attach.)  His analysis employs a probability constant representing a 99.95% confidence level for seven of the urban segments instead of the 95% confidence level utilized by Defendants for all segments.  As a result of his analysis, Mr. Robertson calculates that six of the segments in the Eastern Section have a safety ratio greater than 1.0.[11] (Id.)

Robertson's analysis, if credited, results in the same number of segments having a safety ratio greater than 1.00 when compared to those in the SFEIS/FEIS.  It also results in a nearly identical number of miles of roadway having a safety ratio greater than 1.00 (36.51 miles or approximately 43% of the studied roadway, compared to 38.92 or 46% of the studied roadway in the SFEIS/FEIS).[12]  Yet, as Defendants point out, when Robertson's analysis is compared to that in Table 1-12 in the ROD (which is what Plaintiffs' briefing states Robertson meant to do), it represents the same number of, and the same

---

[11]  It is not clear whether Robertson's corrected safety ratio for one of the six segments (N.C. 66 between Hopkins Road and U.S. 421/I-40 Business) demonstrates a statistically significant result insofar as no confidence interval is noted for it.  (See Robertson Decl. attach.)

[12]  Robertson's analysis would reduce to 32.54 miles or 38.4% of the studied roadway if his corrected safety ratio for the segment of N.C. 66 between Hopkins Road and U.S. 421/I-40 Business is determined not to be statistically significant.

particular, segments exceeding 1.00 that are noted in the ROD.[13]
As a result, and even more to the point, Robertson calculates
the exact number of miles of roadway with a safety ratio
exceeding 1.00 that the ROD reflects: a total of 43% of the
studied roadway. It is therefore hard to understand how
Robertson's proposed Table 1-12 results in a seriously different
picture of the project's environmental impact from a safety
analysis standpoint.

Defendants, moreover, defend their use of a 95% confidence
level for this analysis based on NCDOT's "engineering judgment."
(Lacy Aff. ¶ 11.) Acknowledging that a 99.95% confidence level
is commonly used for urban areas in general (and a 95% level for
rural areas), NCDOT's engineer Lacy states that NCDOT
"typically" uses a probability value for a 95% confidence level
because "using the 99.95% confidence level would imply greater
precision than we can likely expect in screening for high
accident locations." (Id.) Lacy testified further: "While our
results when using the 99.95% confidence level could be
considered correct from a mathematical or statistical
perspective, the amount of engineering judgment that should be

---

[13] The safety ratios for three of the six segments remain unchanged (U.S. 58 between U.S. 421/I-40 Business and N.C. 66, N.C. 66 between U.S. 421/I-40 Business and U.S. 311, and N.C. 66 Connector to Hopkins Road), and the remaining three change marginally (a U.S. 52 segment falls from 1.49 to 1.36, another U.S. 52 segment falls from 1.58 to 1.46, and a N.C. 66 segment falls from 1.18 to 1.07). (Compare Robertson Decl. attach. with ROD at 65.)

applied, the use of estimated exposure values, and the intent of our application of critical crash rates suggest that a 95% confidence level is more reasonable." (Id.)

"Agencies are entitled to select their own methodology as long as that methodology is reasonable." Hughes River/Johnson, 165 F.3d at 289. Moreover, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378. Here, the agency has adequately explained its reasoning for selecting its methodology, and this court will not second-guess an agency's exercise of judgment in its area of expertise. See Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1244 (9th Cir. 2005) (finding, in the context of a NEPA challenge, that because the agency had provided a "thorough and reasoned explanation" for its position, the court would not "take sides in a battle of the experts" (internal quotations omitted)). In the end, Robertson paints a picture very *similar* to that offered in both the SFEIS/FEIS and the ROD. As a consequence, the court cannot say that Table 1-12 in the ROD depicts an analysis so seriously different from that in the SFEIS/FEIS to warrant a supplemental environmental impact statement.

During oral argument, Plaintiffs raised arguments not made in the briefing to attack the SFEIS/FEIS. Raising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage. It is odd, moreover, that Plaintiffs devoted such time and energy to having their expert, Mr. Robertson, analyze the various road segments in his proffered version of Table 1-12 only to shift the emphasis of their attack. None of these other arguments, however, saves Plaintiffs' claims.

Plaintiffs argue that the SFEIS/FEIS was misleading because its analysis was "meaningless." First, they contend that the ROD admits that two of the U.S. 52 segments in the Table 1-12 analysis, which showed a safety ratio greater than 1.00, were made safer by a specific safety improvement, project U-2826B. (See ROD at 54; SFEIS/FEIS, vol. 1 at 2-5 to 2-6.) This cast doubt, Plaintiffs claim, on the ROD's conclusion that these two segments were unsafe. Plaintiffs originally made this argument during the comment period. (ROD at 54.) It lacks merit, as Defendants determined, because the SFEIS/FEIS clearly noted that project U-2826B was slated to widen and upgrade the U.S. 52 roadway and interchanges between I-40 and the Northern Beltway interchange. (Id.; SFEIS/FEIS, vol. 1 at 1-23.) The ROD noted Plaintiffs' objection and explained that the improvements

35

"address short-term safety and operations issues only" and that the "Northern Beltway is relevant regarding safety improvements because it will provide a safer option for travelers." (ROD at 54.) In reality, Plaintiffs' objections do not undermine the agencies' calculation of a safety ratio for the U.S. 52 segments (based on historical figures) but rather challenge the weight it contends the agencies should give the calculation on a going forward basis in light of planned improvements. The agencies' judgment is entitled to deference, and this court will not second-guess it. Mooreforce, Inc. v. U.S. Dep't of Transp., 243 F. Supp. 2d 425, 442 (M.D.N.C. 2003) (noting that "the agencies' actions are entitled to deference by the court absent a clear error of the agencies' judgment"); accord Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir. 2004) (acknowledging that the court is not empowered to substitute its judgment for that of the agency).

Second, as to the four remaining segments for which Table 1-12 in the ROD shows a safety ratio greater than 1.00, Plaintiffs contend that the ratios for two of them (the N.C. 66 segments extending for approximately 10 miles each), are misleading because each segment is heterogeneous and a proper safety ratio analysis requires a homogeneous road segment. These alleged errors result in the conclusion in the SFEIS/FEIS and ROD that each segment has a safety ratio greater than 1.00

when, in fact, only some sub-portion of each segment has a safety problem. This homogeneity problem was compounded, Plaintiffs claim, because of Defendants' use of the ADT weighted average (discussed _supra_). Plaintiffs made this argument to the agency, which addressed and rejected it in the ROD on the grounds that "the division of roadway segments for a crash analysis is performed based on the [e]ngineer's judgment," that "the intention of this analysis is not to identify particular locations with safety issues but to look at the system-level safety performance of roads whose volumes are most likely to be affected by the new project," and that as a planning-level study the analysis did not require homogeneous segments but this factor was taken into account by the agency's use of a 95% confidence level in any event. (ROD at 55.) In other words, the agency concluded that it was not necessary for it to pinpoint the sub-segments of a roadway with a safety issue if the Northern Beltway is designed to relieve traffic on the full segment of that roadway to be traveled. The court cannot say that this conclusion is arbitrary or capricious. _Marsh_, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Finally, Plaintiffs point to the SFEIS/FEIS statement that a purpose of the project was to enhance safety, which provided:

> The Northern Beltway would provide a higher level of safety to traffic that would be diverted from US 52 and NC 66y [sic] to the Beltway because of its design as a modern Interstate facility. *With the Beltway, the accident rate in the eastern study area in 2025 is projected to decrease 11 to 17 percent (whether average or actual accident rates are used to calculate accident rates).*

(SFEIS/FEIS, vol. 1 at 1-11 (emphasis added).) Plaintiffs argue that the second sentence is misleading because it was revised in the ROD to eliminate any prediction of any quantifiable increase of safety, and was replaced with the following:

> Modern interstate-standard facilities are the safest facility NCDOT can provide to the public. These facilities have the highest design-standards to minimize the potential for crashes, and built-in protections to lessen the severity of crashes that do occur. The Eastern Section of the Beltway (a modern interstate-standard facility) would provide the motoring public a safer choice than many of the existing routes available today.

(ROD at 63-64.) The ROD explains that "[a]lthough a 2025 projected accident analysis was included in the SFEIS/FEIS, it was determined by NCDOT not to be a valid analysis, and was removed from the SFEIS/FEIS (as discussed further in Section 2.10.5)." (ROD at 63.)

Plaintiffs argue that the ROD's elimination of the reference to an 11 to 17 percent reduction in the accident rate and the admission that the 2025 projected accident analysis was

38

not valid demonstrates that the safety analysis presented is seriously different from that contained in the SFEIS/FEIS. The problem with Plaintiffs' argument is that it does not undermine the Table 1-12 safety analysis, which examined 1999-2002 *historical* accident rates for the thirteen road segments from which the Northern Beltway is designed to relieve traffic. What the ROD did was to acknowledge the agency's lack of an acceptable model for projecting into the year 2025 how, if at all, those rates would change. Safety indeed remained a component of the Eastern Section analysis and purpose, as the ROD noted that the safety analysis demonstrated that there were segments of high volume roadways in eastern Forsyth County (e.g., U.S. 52, U.S. 158 and N.C. 66) that had safety ratios greater than 1.0 and "[f]or these reasons, safety is a component of the purpose and need for Projects U-2579 and U-2579A." (ROD at 64.) In fact, the ROD noted the corrected safety ratios for these segments. (Id. at 63-65.) Section 2.10.5 of the SFEIS/FEIS clearly noted, therefore, that the agency would rely on general safety benefits of modern highways in concluding that the Eastern Section would result in a safer choice than many of the existing routes available at the time. (SFEIS/FEIS, vol. 1 at 2-114.) The agency based its conclusion, too, on the fact that the Eastern Section is expected to divert traffic from U.S. 52 between U.S. 421/I-40 Business and Akron Drive, which

presently has a high critical crash rate. (Id.) In considering the above, it is apparent that the agency did not rely on the projected quantitative reduction in accidents that appeared in the SFEIS/FEIS summary of purposes for the Eastern Section. In addition, the court concludes that the ROD's removal of the reference to a quantitative reduction in projected accident rates that appeared in the SFEIS/FEIS summary of purposes did not render the SFEIS/FEIS misleading. The substantive discussion of the SFEIS/FEIS clearly explained the limitations on the agency's ability to project accident rates into the year 2025, the agency's disavowal of such a quantitative projection, and the reasoning for the agency's conclusion that was based in part on the Table 1-12 data.

In sum, considering all Plaintiffs' arguments, the court concludes that Defendants did not violate NEPA with respect to their treatment of the safety analysis. The ROD reflects that the agency took a hard look at the corrected safety ratio analysis and reasonably concluded that the proposed project was not significantly affected by it.

### 2.    Equitable Considerations

This conclusion is consistent with an analysis of the equitable considerations involved. Rule 60(b)(5) also permits relief from a prospective injunction where "applying it prospectively is no longer equitable." The Fourth Circuit has

explained that when considering this remedial provision, "a district court's task is to determine whether it remains equitable for the judgment at issue to apply prospectively and, if not, to relieve the parties of some or all of the burdens of that judgment on 'such terms as are just.'" Alexander v. Britt, 89 F.3d 194, 197 (4th Cir. 1996). While most cases involve injunctions under different circumstances, courts have identified a non-exhaustive list of factors to consider in determining whether to dissolve an injunction, which include the following: circumstances leading to the injunction and nature of conduct to be prevented; length of time since issuance; whether compliance has occurred; likelihood that the conduct sought to be prevented will recur absent the injunction; and whether the objective of the injunction has been achieved. See Crutchfield v. U.S. Army Corps of Eng'rs, 175 F. Supp. 2d 835, 844 (E.D. Va. 2001); accord Thompson, 404 F.3d at 827; MicroStrategy, Inc. v. Bus. Objects, S.A., 369 F. Supp. 2d 725, 734-36 (E.D. Va. 2005).

Here, the injunction was issued to prevent Defendants from taking any action in furtherance of construction of the Northern Beltway until the appropriate approvals for the environmental analysis were obtained and had culminated in the issuance of a new ROD. The injunction was entered over ten years ago and has brought development of the Northern Beltway to a virtual standstill. Defendants contend that they have complied with the

41

injunction in good faith and point out that in the interim State Defendants have sought and obtained, with consent of Plaintiffs, multiple amendments to the Order of Dismissal to permit limited actions with respect to property in the path of the project. The objective of the decree -- that the Defendants recommit their efforts to redo the environmental impact analysis -- has occurred. Finding compliance with the court's mandate of obtaining requisite approvals and issuance of a ROD pursuant to applicable federal law, the court concludes that further imposition of the injunction in this case would be inappropriate and would only delay a highway project that has already been delayed by this litigation.

In summary, upon review of the merits of Plaintiffs' NEPA challenge to the SFEIS/FEIS and ROD, and balancing the policies of finality of judgments and of justice, the court concludes that Defendants' motion to dissolve the injunction within the 1999 Order of Dismissal should be granted because Defendants have complied with its terms and continued application would no longer be equitable.

**B.   Case 1:08cv570:  NEPA Challenges**

In case 1:08cv570, Plaintiffs challenge the SFEIS/FEIS on two grounds.   (See Doc. 21.)   First, they contend that Defendants violated NEPA by not considering the effect the Northern Beltway would have on global climate change through the

42

production of greenhouse gases. Second, they contend that Defendants failed to account for the impact of two future, proposed connecting road construction projects, the Southern Loop and Airport Connector, not contained in the current project. Each is addressed below.

Because claims brought under the APA are adjudicated on the basis of an existing administrative record, they are properly decided on summary judgment. _Citizens for the Scenic Severn River Bridge, Inc. v. Skinner_, 802 F. Supp. 1325, 1332 (D. Md. 1991), _aff'd_, 972 F.2d 338 (4th Cir. 1992); _see also_ _Pit River Tribe v. U.S. Forest Serv._, 469 F.3d 768, 777 (9th Cir. 2006); 10B Wright & Miller, Federal Practice and Procedure § 2733 (3d ed. 2007). The administrative record, subject to any supplementation permitted by the court, serves as the complete factual predicate for the court's review. _Krichbaum v. Kelley_, 844 F. Supp. 1107, 1110 (W.D. Va. 1994), _aff'd_, 61 F.3d 900 (4th Cir. 1995). To prevail on summary judgment, a party must identify facts -- or factual failings -- in the administrative record that support its claims under NEPA and the APA. _See_ _id._ Thus, summary judgment is appropriate where there is no genuine issue of material fact whether the agency violated NEPA and the moving party is entitled to judgment as a matter of law. _See_ Fed. R. Civ. P. 56(c); _Celotex Corp. v. Catrett_, 477 U.S. 317, 322-23 (1986).

43

Before reaching the merits, a preliminary matter must be resolved: Defendants' motion to strike appendices Plaintiffs filed to supplement the record.[14]

### 1. Motion to Strike

Federal Defendants move to strike several documents Plaintiffs attached to their motion for summary judgment and reply brief, specifically appendices 1, 5, 8, 9, 13, and 16 through 22. (Doc. 41 at 1-2.) Federal Defendants contend that Plaintiffs have not demonstrated that the extra-record documents

---

[14] Plaintiffs have asserted that no material issue exists as to their standing to maintain the current lawsuit and included thirteen declarations from association members recounting the harm the Northern Beltway would cause to them and their property. (Doc. 21 at 6.) Defendants have not opposed, or even addressed, this issue in the briefing, nor is there any indication that Defendants disputed standing in the previous case, N.C. Alliance, 151 F. Supp. 2d 661.

To demonstrate standing, a party must have an injury-in-fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Under the APA, parties "adversely affected or aggrieved by an agency action within the meaning of a relevant statute" may seek judicial review. 5 U.S.C. § 702; see also Fed. Election Comm'n v. Akins, 524 U.S. 11, 19 (1998) (the word "aggrieved" shows congressional intent to "cast the standing net broadly"). Here, members of the Plaintiff associations include property owners who will have their property bisected by the highway project, who will have their homes taken, and who will lose the pastoral feel of their property as a result of the highway project approved by the ROD. See, e.g., Doc. 19, app. 1 (stating project will take 21 acres of property and bisect 92-acre family farm); Doc. 19, app. 3 (noting home will be taken by Northern Beltway and bisect 12-acre tract of land); Doc. 19, app. 11 (claiming Northern Beltway will cross family property three times). As such, the court finds that Plaintiffs' alleged injuries are concrete in nature and traceable to the highway project; additionally, a favorable ruling could redress their claimed injuries because Defendants could be required to redo the environmental impact statement and reconsider whether to approve the project. Plaintiffs therefore have standing to present their current challenges.

fall within any exception to the record review rule. Though conceding that the APA generally limits judicial review to the administrative record, Plaintiffs contend that extra-record evidence should be considered in this case for three reasons: (1) to demonstrate that the agency failed to consider factors relevant to its final decision, (2) the case is complex and involves technical issues, and (3) there was evidence arising after the final agency action demonstrating that the decision is erroneous. These factors are especially applicable, Plaintiffs argue, in NEPA cases, where the issue is whether the agency properly considered all relevant factors. (Doc. 35 at 13.)

Under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam). The Supreme Court has noted two situations where extra-record material may be admitted: (1) where there is a "strong showing of bad faith or improper behavior" and (2) where "the bare record [does] not disclose the factors that were considered or the Secretary's construction of the evidence." Overton Park, 401 U.S. at 420.

In addition, the Fourth Circuit has "acknowledg[ed] the importance of extra-record evidence in NEPA cases to inform the court about environmental factors that the agency may not have considered." Ohio Valley Envtl. Coalition, 556 F.3d at 201.

45

Indeed, "in the NEPA context, 'courts generally have been willing to look outside the record when assessing the adequacy of an EIS or a determination that no EIS is necessary.'" Id. (quoting Webb v. Gorsuch, 699 F.2d 157, 159 n.2 (4th Cir. 1983)). This is due in part to the fact that "a NEPA suit is inherently a challenge to the adequacy of the administrative record," which is subject to challenge by the evidence the agency failed to consider. Id. Not surprisingly, therefore, district courts have considered extra-record evidence where a party seeks to demonstrate that the agency relied on documents not in the record, to illustrate factors the agency should have considered, to provide background information, and to show bad faith. See, e.g., Piedmont Envtl. Council v. U.S. Dep't of Transp., 159 F. Supp. 2d 260, 270 (W.D. Va. 2001), aff'd in part and remanded in part, 58 F. App'x 20 (4th Cir. 2003) (NEPA case); Krichbaum v. U.S. Forest Serv., 973 F. Supp. 585, 589 (W.D. Va. 1997), aff'd, 139 F.3d 890 (4th Cir. 1998) (NEPA case).

Plaintiffs' appendix 1 is a fact sheet from the EPA entitled "Greenhouse Gas Emissions from a Typical Passenger Vehicle." Plaintiffs contend this fact sheet provides a simple formula for quantifying increased greenhouse gas emissions based upon vehicle miles traveled that should have been used in the SFEIS/FEIS. According to Plaintiffs' argument, because the

46

SFEIS/FEIS evaluated vehicle miles traveled for the Northern Beltway but failed to apply this formula, all relevant factors were not considered. Federal Defendants argue that, because the broader decision not to evaluate greenhouse gases was reasonable, there was no need to consult such data. Because Plaintiffs allege that Defendants failed to consider all relevant factors in arriving at its decision not to evaluate greenhouse gases, the court will consider this document, and Federal Defendants' motion to strike will be denied.

The remaining challenged appendices all involve the proposed Airport Connector.[15] Plaintiffs argue that these documents show that the Airport Connector is reasonably foreseeable so that the SFEIS/FEIS should have considered its

---

[15] The remaining challenged appendices are as follows: (5) September 22, 2004, vision plan map for NCDOT's Strategic Highway Corridors initiative; (8) January 27, 2005, minutes of the Winston-Salem MPO Transportation Advisory Committee ("TAC"); (9) June 15, 2005, minutes of the North Carolina Turnpike Authority; (13) July 21, 2005, minutes of the Winston-Salem TAC; (16) November 3, 2005, list of revisions to the 2006-2012 TIP showing the Airport Connector; (17) September 2004 NCDOT Long Range Plan; (18) September 2, 2004, press announcement of Gov. Michael Easley noting approval of 25-year state plan; (19) January 4, 2007, Winston-Salem 2007-2013 MPO TIP noting Airport Connector as unfunded; (19A) August 21, 2008, Winston-Salem MPO TIP for 2009-2015 noting the Airport Connector as "programmed for planning and environmental study only, future North Carolina Turnpike Project"; (20) March 1, 2007, Greensboro Urban Area MPO noting the Airport Connector as "programmed for planning and environmental study only"; (21) 2030 Winston-Salem Urban Area Long Range Transportation Plan noting that the "2020 network includes all of the existing major streets and highways, and the recommended and widened roads that will be completed from 2015 through 2020"; and (22) Table 3.13 of the Greensboro Urban Area 2030 Long Range Transportation Plan noting "2021-2030 noteworthy projects include . . . the Airport Connector." (Doc. 39, appendices.)

47

cumulative impact. (Doc. 35 at 8.) Plaintiffs further allege that the challenged appendices "show a carefully orchestrated effort by NCDOT" to add the Airport Connector to the state TIP and fund it through the North Carolina Turnpike Authority ("NCTA"), thus circumventing any need to analyze its impact in the SFEIS/FEIS. (Id. at 9.)

The court finds that, although there appears to be some duplication between the challenged appendices and record evidence (compare app. 12 (recording the minutes and vote at a June 15, 2005, NCTA meeting to study the Airport Connector as a toll road) with app. 13 (acknowledging the June 15, 2005, NCTA vote)), these documents will be considered in support of Plaintiffs' claim that the impact of the Airport Connector should have been evaluated in the SFEIS/FEIS. Appendix 19A stands on a slightly different footing. It is dated August 21, 2008, and therefore was published after the final agency action. The court will allow it to be considered in support of Plaintiffs' argument that the Airport Connector was reasonably foreseeable because it shows the Airport Connector as a project on the Winston-Salem Urban Area MPO TIP for 2009-2015 (albeit "for planning and environmental study only" and as a "future" NCTA project).

Plaintiffs also seek, however, to have the court draw inferences from statements of those in attendance at various

48

meetings reflected in the appendices and from the omission of these documents (which Defendants assert they did not rely upon) to conclude that, despite Defendants' representations, Defendants were engaged in a coordinated effort to secure funding for the Airport Connector in the near future and therefore omitted the project from the SFEIS/FEIS solely out of concern that its inclusion would delay approval of the Northern Beltway. To the extent Plaintiffs seek to argue a bad faith exception to the record evidence rule, the court finds these documents inadequate for that purpose. See Overton Park, 401 U.S. at 420 (requiring a "strong showing" of bad faith). Rather, as discussed below, these documents demonstrate only that Defendants were coordinating with NCTA in the event the Airport Connector ever received funding in the future. They do not show, much less make a strong showing, that Defendants were scheming to avoid analysis of the Airport Connector in the SFEIS/FEIS and thereby circumvent their NEPA obligations.

For the above reasons, therefore, Defendants' motion to strike Plaintiffs' extra-record appendices will be denied.

### 2. Omission of Analysis of Greenhouse Gas Contribution to Global Climate Change

Plaintiffs seek summary judgment on their claim that Defendants' failure to evaluate greenhouse gas emissions in the SFEIS/FEIS violated NEPA's requirement that the agencies

49

evaluate indirect effects and cumulative impacts of the proposed action. (Doc. 21 at 11-14.) Plaintiffs argue that merely because greenhouse gas emissions may affect global climate change only slightly does not abrogate the agencies' requirement to evaluate it as an unknown or uncertain impact under Council on Environmental Quality ("CEQ") regulations. (Doc. 21 at 11.) Moreover, Plaintiffs argue, the SFEIS/FEIS concludes that the Northern Beltway, when viewed with other projects, will increase vehicle miles traveled in Forsyth County and will result in an increased release of greenhouse gases. Finally, Plaintiffs cite to proposed EPA reporting regulations for businesses and an analysis for vehicle greenhouse gas emissions contained in the EPA's "Greenhouse Gas Emissions from a Typical Passenger Vehicle" in appendix 1. Employing such analyses, Plaintiffs contend, "would have allowed the decision-maker and the public to understand the correlation between new highway construction and the problem of global climate change." (Doc. 39 at 7.)

State and Federal Defendants have filed cross-motions for summary judgment. State Defendants assert that summary judgment is appropriate because greenhouse gas evaluation is not mandated by NEPA, air quality review agencies were consulted in order to determine the scope of review for the project, and public comment regarding the omission of greenhouse gas analysis was adequately addressed. (Doc. 28 at 29-36.) Federal Defendants

50

argue that (1) climate change analysis is not required and no national standard exists for their evaluation in this context; and (2) Plaintiffs failed to show that an increase in vehicle miles traveled would significantly impact greenhouse gas emissions. (Doc. 31 at 22-34.) Both Defendants also contend that it was reasonable to omit greenhouse gas analysis from the SFEIS/FEIS because any determination of its impact on overall global climate change would have been highly speculative and thus not useful.

Under NEPA, Defendants had an obligation to take a "hard look" at "any adverse environmental effects" of the project. 42 U.S.C. § 4332(2)(C). The CEQ regulations explain that these include "indirect effects," which are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.[16] An agency can satisfy this duty by obtaining and considering opinions from its own experts and others, and by giving careful

---

[16]  The CEQ regulations define "indirect effects" as follows:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

40 C.F.R. § 1508.8(b). "Effects and impacts as used in these regulations are synonymous." Id.

scientific scrutiny to and responding to all legitimate concerns raised. Hughes River/Johnson, 165 F.3d at 288. An agency must also consider the cumulative impact of a proposed action.[17] 40 C.F.R. § 1508.7.

"[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any potential new information to the decisionmaking process." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004); see Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987) ("[T]he NEPA process involves an almost endless series of judgment calls. . . . The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."); 40 C.F.R. § 1500.1(b) ("NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."). NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as

---

[17] The CEQ regulations define "cumulative impact" as follows:

> Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

too remote, speculative, or . . . impractical or ineffective."
Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th
Cir. 1999) (quoting All Indian Pueblo Council v. United States,
975 F.2d 1437, 1445 (10th Cir. 1992)).

The SFEIS/FEIS devotes approximately twenty pages to
analysis of air quality issues. (SFEIS/FEIS, vol. 1, at 3-50 to
3-53, 4-85 to 4-102.) Here, Defendants involved EPA, the North
Carolina Division of Air Quality, and the Forsyth County
Environmental Affairs Department in the initial scoping of the
NEPA process. (SFEIS/FEIS, vol. 3, app. D, sec. 6; AR 29025.)
None of these agencies directed Defendants to evaluate potential
impacts of greenhouse gas emissions on global warming.
Defendants evaluated six pollutants pursuant to National Ambient
Air Quality Standards ("NAAQS") promulgated by EPA under the
Clean Air Act:[18] carbon monoxide, nitrogen dioxide, sulfur
dioxide, ozone, particulate matter, and lead. (SFEIS/FEIS, vol.
1 at 3-50.) The SFEIS/FEIS reports on the extensive carbon
monoxide air modeling Defendants conducted for the Northern
Beltway and concludes that the project will not "cause
exceedances of the [NAAQS]" through 2025. (SFEIS/FEIS, vol. 1
at 4-85.) The SFEIS/FEIS concludes that ozone was not a concern
on the project level and that analysis of ozone, hydrocarbons,
and nitrogen oxide are unnecessary and infeasible on a project-

---

[18]  The NAAQS standards do not regulate any of the greenhouse gases.

by-project basis. (Id. at 4-94.) This court previously deferred to the agencies' expertise in deciding not to include a quantitative analysis of ozone. N.C. Alliance, 151 F. Supp. 2d at 694.

The SFEIS/FEIS also concluded that the Northern Beltway complies with the Clean Air Act's requirement that the project conform to the approved State Implementation Plan (an EPA-approved plan for complying with federal law and mitigating air quality impacts). See 40 C.F.R. §§ 51.854, 51.858 to 51.860. As noted in the SFEIS/FEIS, this conformity is "intended to ensure that a state does not undertake federally funded or approved transportation projects, programs, or plans that are inconsistent with the state's obligations to meet and maintain the NAAQS." (SFEIS/FIES vol. 1 at 4-93.) Thus, even with the potential additional vehicle miles traveled, the levels of these six pollutants will be less than the caps set in the state implementation plan. (Id. at 4-94 to 4-102.)

During the public comment period, Plaintiffs submitted comments to the SFEIS/FEIS (see ROD app. C), contending that vehicle miles traveled from the Northern Beltway would increase up to seven percent and cause a detrimental effect on global warming. FHWA responded in the ROD as follows:

> From a policy standpoint, FHWA's current approach on the issue of global warming is as follows. To date, no national standards have been established

54

regarding greenhouse gases, nor has EPA established criteria or thresholds for greenhouse gas emissions. On April 2, 2007, the Supreme Court issued a decision in Massachusetts et al. v. Environmental Protection Agency et al. that the USEPA does have authority under the Clean Air Act to establish motor vehicle emissions standards for $CO_2$ emissions. The USEPA is currently determining the implications to national policies and programs as a result of the Supreme Court decision. However, the Court's decision did not have any direct implications on requirements for developing transportation projects.

FHWA does not believe it is informative at this point to consider greenhouse gas emissions in an Environmental Impact Statement (EIS). The climate impacts of $CO_2$ are global in nature. Analyzing how alternatives evaluated in an EIS might vary in their relatively small contribution to a global problems [sic] will not better inform decisions. Further, due to the interactions between elements of the transportation system as a whole, emissions analyses would be less informative than ones conducted at regional, state, or national levels. Because of these concerns, FHWA concludes that we cannot usefully evaluate $CO_2$ emission in this SFEIS/FEIS in the same way that we address other vehicle emissions.

(ROD at 57.)

NEPA requires an analysis of air quality. See 40 C.F.R. §§ 1502.16, 1508.8(b). However, it does not expressly refer to climate change or greenhouse gas emissions. Nor are Plaintiffs able to identify any case holding that NEPA requires analysis of the potential impact of greenhouse gas emissions on overall global climate change in connection with a proposed highway project. Plaintiffs rely, rather, on Massachusetts v. EPA, 549 U.S. 497 (2007), and Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172 (9th Cir.

55

2008), both of which discuss greenhouse gases and global climate change in other contexts. In the former, the Supreme Court held that EPA acted arbitrarily and capriciously in rejecting a rulemaking petition seeking to require it to regulate greenhouse gas emissions for new motor vehicles under the Clean Air Act. 549 U.S. at 534-35. Plaintiffs here seize upon the Court's characterization of a "well-documented rise in global temperatures [that has] coincided with a significant increase in the concentration of carbon dioxide in the atmosphere" and note that "[r]espected scientists believe the two trends are related." Id. at 504. In the latter case, the Ninth Circuit held that the National Highway Traffic Safety Administration acted arbitrarily and capriciously in failing to set certain standards for reductions of greenhouse gas emissions from light trucks. 538 F.3d at 1200. Here, too, Plaintiffs point to the court's discussion of the environmental effects of global warming cited by various studies made a part of the record in that case.[19]

---

[19] Defendants do not appear to directly challenge the existence of a relationship between the production of greenhouse gases and global climate change, relying rather on their other arguments. The court need not and does not decide, therefore, whether Plaintiffs have created an adequate *factual* record in support of its claim, although it appears doubtful that they have. Plaintiffs conceded at oral argument that they provided no scientific documentation of the claim during the administrative process and seek to rely solely on the factual conclusions as set forth in Massachusetts v. EPA and Center for Biological Diversity as factual proof in this case. Permitting parties to circumvent the administrative process in this fashion by

These two cases are readily distinguishable and cannot be
read to impose a duty on Defendants to consider the potential
contribution a federal highway project may have to global
climate change. Plaintiffs' challenge is more like that raised
in <u>Audobon Naturalist Society of The Central Atlantic States,
Inc. v. U.S. Department of Transportation</u>, 524 F. Supp. 2d 642,
708 (D. Md. 2007). There, plaintiffs alleged a violation of
NEPA in a federal highway project for defendants' failure to
consider its impact on global climate change. The court found
that the government agencies did consider this issue but
concluded that analysis of greenhouse gas emissions on a
project-level basis was not useful because no national
regulatory thresholds had been established. <u>Id.</u> The court
concluded that the defendants did not act arbitrarily or
capriciously in concluding that no mitigation was needed "for
the supposed impacts of a single stretch of highway on the
global problem of climate change."[20] <u>Id.</u>

_____

arguing that facts have been established against the government
through prior litigation against it would appear improper. <u>See</u> <u>United
States v. Mendoza</u>, 464 U.S. 154, 162 (1984) (holding nonmutual
offensive collateral estoppel generally inapplicable against the
government to preclude re-litigation of issues). Plaintiffs' attempt
to cite additional scientific studies in their briefing before this
court also seeks to circumvent the administrative process.

[20] Plaintiffs argue that <u>Audobon Naturalist</u> is distinguishable because
there the court lacked record evidence, present here, that the project
would increase vehicle miles traveled. This argument is unpersuasive.
The <u>Audobon Naturalist</u> court presumed there could be some effect on
greenhouse gas emissions but declined to disturb the agency's judgment
not to attempt to quantify or mitigate it.

In the present case, Defendants clearly examined the issue of climate change and acknowledged their decision not to evaluate greenhouse gas emissions in the environmental impact statements. (See ROD at 57.) Defendants cited the lack of either national standards or EPA criteria or thresholds, and they concluded they could not usefully evaluate any impact on a project-level basis such as this given the interactions of the elements of the transportation system. (Id.) Plaintiffs attack Defendants' conclusion that no national standards exist for evaluating the issue, arguing that Defendants should have considered proposed EPA rules requiring annual greenhouse gas reports from certain stationary facilities. See 74 Fed. Reg. 16448 (Apr. 10, 2009). But as Defendants aptly point out, these were only *proposed* regulations at the time, do not apply to highway projects, and post-date the ROD. (Doc. 31 at 14.) Defendants' failure to employ them did not violate NEPA.

Plaintiffs also point to the 2005 EPA fact sheet submitted as appendix 1, which sets forth a formula for calculating greenhouse gas emissions for passenger vehicles. However, EPA was consulted during the scoping of the project and allowed to comment upon the SFEIS/FEIS. (See, e.g., ROD app. C.) Under NEPA, EPA is the agency charged with determining whether a federal activity will adversely impact the "public health or welfare or environmental quality." 40 C.F.R. 1504.1(b). At no

58

time, however, did EPA suggest the need to study greenhouse gases. Additionally, it is not reasonable to expect Defendants to be on notice of the 2005 EPA document, especially where Plaintiffs themselves were unaware of it and did not present it during the comment review period. Cf. Linemaster Switch Corp. v. EPA, 938 F.2d 1299, 1306 (D.C. Cir. 1991) (finding that EPA need not comb all relevant offices for potentially relevant data). This court finds that Defendants' failure to consider this EPA document was reasonable in light of its ROD explanation (see ROD at 57) and its reliance upon two FHWA documents in the SFEIS/FEIS (see SFEIS/FEIS, vol. 1 at 4-94 (referencing Discussion Paper on the Appropriate Level of Highway Air Quality Analysis for a CE, EA/FONSI, and EIS (April 7, 1986) and Technical Advisory (T 6640.8A Oct. 30 1987))), which direct that ozone and hydrocarbon production are not susceptible to meaningful evaluation on a project basis.

Plaintiffs also contend that the SFEIS/FEIS projects that the Northern Beltway will increase vehicle miles traveled by 1.8 percent (218,000 miles traveled countywide daily) which, they argue, will increase greenhouse gas emissions. However, as Defendants point out, the increase in induced travel (defined as increased vehicle traffic due to increased roadway capacity) by the Northern Beltway alone is 1.05 percent; the 1.8 percent figure relied on by Plaintiffs encompasses the expected increase

59

in induced travel from all reasonably foreseeable projects in the study area by 2025. (SFEIS/FEIS, vol. 1, at 4-243.) Defendants also note that Plaintiffs' argument is based solely on vehicle miles traveled and fails to consider other important variables, including increased speeds on the Northern Beltway, improved vehicle fuel economy, and the use of cleaner fuels. Citing to the FHWA's Spreadsheet Model Induced Travel Estimation (known also as "SMITE") models, the SFEIS/FEIS shows that the increase in vehicle miles traveled will largely be absorbed by the new freeway components and shifting vehicles from other roadways. (Id. at 4-243.) The Northern Beltway will have fewer acceleration events that contribute substantially to negative air quality impacts for ozone precursors and carbon monoxide. (Id.) Defendants concluded that, based on their modeling, the amount of induced travel resulting from the Northern Beltway is "not appreciable." (Id.) Where an agency is making predictions based on its expertise, a reviewing court is at its most deferential. Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983). Thus, this court finds that Defendants did not violate NEPA by failing to address global climate change based on vehicle miles traveled for the project.

Based on the above, the court concludes that Defendants reasonably considered the major environmental consequences of

the Northern Beltway and have provided a rational basis for
their decision not to quantitatively analyze the potential
effect greenhouse gas emissions may have on global climate
change. See Hughes River/Johnson, 165 F.3d at 288. Thus, the
court finds, the omission of further analysis of greenhouse
gases did not violate NEPA.

### 3. Omission of Southern Loop & Airport Connector from the SFEIS/FEIS

Plaintiffs allege that two road projects, the Southern Loop
and the Airport Connector, should have been considered in the
SFEIS/FEIS. Plaintiffs argue that both projects are cumulative
actions that should be analyzed pursuant to 40 C.F.R. § 1508.25.
Alternatively, Plaintiffs contend that both projects are
reasonably foreseeable and thus should be acknowledged and
analyzed pursuant to 40 C.F.R. § 1508.7. Defendants argue that
both projects are too indefinite to constitute a proposal and
consequently there is no obligation to assess their impact on
the environment as a cumulative action. Defendants also contend
that neither project is reasonably foreseeable because neither
is funded, developed or imminent. (Doc. 31 at 35; Doc. 28 at
43.)

CEQ regulations provide that "[c]umulative actions, which
when viewed with other proposed actions have cumulatively
significant impacts," should be discussed in the same

environmental impact statement. 40 C.F.R. § 1508.25(a)(2). An action is not required to be considered within a single environmental impact statement, however, unless it is sufficiently definite to constitute a "proposal." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.20 (1976); Mooreforce, 243 F. Supp. 2d at 441 (holding that "[p]rojects that are not imminent are not considered proposals, and therefore, do not require an analysis of cumulative impacts"); see 42 U.S.C. § 4332(2)(C) (requiring detailed statement of environmental impacts in recommendations on proposals). A proposal exists "at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23. As noted, the scope of an environmental impact statement is committed to agency discretion as it implicates agency expertise. See Kleppe, 427 U.S. at 412-13 (noting agency action should be upheld regarding the scope of the project absent evidence that is arbitrary and capricious); N.C. Alliance, 151 F. Supp. 2d at 684 (noting agency given "considerable discretion" in scoping).

As noted earlier, an agency must also consider the cumulative impact "which results from [the] incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions." <u>Id.</u> § 1508.7; <u>see</u> <u>Dep't of Transp.</u>
<u>v. Public Citizen</u>, 541 U.S. 752, 769 (2004). To constitute a
reasonably foreseeable future action, a project must be
"imminent," "inevitable," or one that can be sufficiently
concrete that consideration of its effects would be "useful to a
reasonable decision-maker." <u>Sierra Club v. Marsh</u>, 976 F.2d 763,
768 (1st Cir. 1992) (projects must have "sufficient specificity
to make their consideration useful"); <u>Airport Impact Relief v.</u>
<u>Wykle</u>, 192 F.3d 197, 206 (1st Cir. 1999) (project was "neither
imminent nor inevitable"); <u>Dubois v. U.S. Dep't of Agric.</u>, 102
F.3d 1273, 1286 (1st Cir. 1996) (project must have sufficient
specificity to be useful).

    In order to assess whether the effects of the Southern Loop
and the Airport Connector should have been considered by
Defendants, the different designations applied to highway
projects and their associated ramifications must be considered.
Generally, from the more visionary to the more specific, they
are as follows:

- A statewide LRTP provides for development of an
    intermodal statewide transportation system over a
    minimum twenty year forecast period and may, but need
    not, contain a financial plan (<u>i.e.</u>, documentation
    demonstrating consistency between reasonably available

63

and projected sources of revenues and implementation costs).  23 U.S.C. § 135(f); 23 C.F.R. § 450.104.

- A Comprehensive Transportation Plan ("CTP") -- referred to as a Thoroughfare Plan during the timeframe of this case -- is a vision for long range transportation systems that may include projects that are not included in a financially constrained plan or are anticipated to be needed beyond the horizon year required by federal law (23 U.S.C. § 134).  See N.C. Gen. Stat. § 136-66.2 (noting such a plan goes beyond twenty years); Doc. 27, Ex. 1, Declaration of Calvin Leggett, P.E. ("Leggett Decl."), ¶ 9 (noting name change).

- Metropolitan areas of a state, through duly designated policy boards, may develop an MPO LRTP to implement the goals of transportation planning.  This type of plan contains a subset of CTP projects that may be funded twenty years or more in the future.  23 U.S.C. § 134(c).  An MPO LRTP must include a financial plan but may include for illustrative purposes additional projects that would be included if reasonable additional resources beyond those identified were available.  Id. § 134(i)(2)(C).

64

- Another type of highway planning is a TIP, which comes in two forms: statewide and metropolitan.

  - A State Transportation Improvement Program ("STIP") is a statewide prioritized list of projects that is consistent with the LRTP and metropolitan TIPs. 23 U.S.C. § 135(g); 23 C.F.R. § 450.104; N.C. Gen. Stat. § 143B-350(f)(4). A STIP is required for a project to be eligible for federal aid funding. 23 U.S.C. §§ 134-35; 23 C.F.R. § 450.104. However, a STIP does not require a financial plan but can list a project "only if full funding can reasonably be anticipated to be available for the project within the time period contemplated for completion of the project." 23 U.S.C. § 135(g)(4)(E)-(F). A STIP covers a period of no less than four years but may cover more if authorized by state law, which North Carolina has extended to seven years. See 23 U.S.C. § 135(g)(1); 23 C.F.R. 450.216(a); N.C. Gen. Stat. § 143B-350(f)(4). Thus, to the extent a project is listed in a STIP covering more than four years, its listing in the additional years

65

is considered for informational purposes only. 23 C.F.R. § 450.216(a).

- A metropolitan TIP ("MTIP") is a four-year financially constrained (meaning the project has committed, available or reasonably available revenue sources) list of projects that is federally approved, 23 U.S.C. § 134(j); Leggett Decl. ¶ 16, and that is a component of the STIP, 23 U.S.C. § 135(g)(4)(D)(ii). An MTIP must include a financial plan. 23 U.S.C. § 134(j)(2)(B). An MTIP can list a project only if full funding can reasonably be anticipated to be available within the four-year period contemplated; however, additional projects can be included for illustrative purposes if reasonable additional resources beyond those identified were available. 23 U.S.C. § 134(j)(2)(B) & (D). Additionally, a project may be listed beyond the four year period for illustrative purposes only. 23 C.F.R. § 450.324(a). A STIP and MTIP are therefore similar in purpose, with the major difference being in the geographic coverage of each program, and are governed by almost identical regulations.

With this background in mind, the court turns now to an examination of both road projects.

### a.   Southern Loop

The Southern Loop in concept would be a ten-mile, four-lane divided highway connecting U.S. 311 to South Stratford Road. (Winston-Salem/Forsyth County Urban Area Thoroughfare Plan, Technical Report, Feb. 28, 2002, AR 18829.)   It is not identified as a contemplated urban loop project in the Highway Trust Fund Act, N.C. Gen. Stat. § 136-180(a).[21]   It was not part of the 2030 LRTP or the 2006-2012 STIP. (See SFEIS/FEIS, vol. 1 at 1-21 to 1-28, 6-85; id. vol. 2 at fig. 1-6; ROD at 51.) Consequently, the Southern Loop has no identified source of reasonably available funding.   It appears only in the Winston-Salem 2005 Thoroughfare Plan/CTP as an unfunded, financially unconstrained project that may be funded twenty or more years in the future.   (SFEIS/FEIS, vol. 2 at fig. 1-7; Leggett Decl. ¶ 10.)

Defendants provided the following responses to Plaintiffs' comments that the SFEIS/FEIS should have considered the Southern Loop:

>     As stated in the response to Comment 100-2 in the
> SFEIS/FEIS, page 6-85:  "The Southern Loop is not a

---

[21]   In this respect, the Southern Loop differs from the Western Section and Eastern Section of the Northern Beltway and this court's prior analysis of those Sections as segments constituting cumulative actions that required consideration as a single project.  N.C. Alliance, 151 F. Supp. 2d at 680-86.

> funded project, is not in the TIP, and is not included
> in the 2030 Long Range Transportation Plan.
> Therefore, it is not a reasonably foreseeable project
> and is not included in this study."

(ROD at 51.)

Plaintiffs point to the length of time that the Southern Loop has been discussed as an indication of the longevity, and implicitly the foreseeability, of the project such that it should have been included in the SFEIS/FEIS. (Doc. 21 at 19.) The length of time a project has been discussed, however, is not controlling. In fact, mere discussions even over a long period do not necessarily mean that a project has the funding or necessary studies performed such that a decision is fairly imminent. Plaintiffs seem to appreciate the weakness of their argument because their reply brief focuses solely on the foreseeability of the Airport Connector. (See Doc. 39 at 12 (noting the Airport Connector as "the stronger of the two arguments").)

The court finds that the Southern Loop fails to constitute a proposal and cannot be deemed to be a cumulative action. See Kleppe, 427 U.S. at 410 n.20. The court further finds that it is not a reasonably foreseeable future action under 40 C.F.R. § 1508.7. Defendants, therefore, did not violate NEPA by failing to assess its cumulative impacts.

## b.   Airport Connector

The Airport Connector, also referred to as the I-73/I-74 Connector, is contemplated as an east-west four-lane divided highway running from Winston-Salem (connecting to the Eastern Section of the Northern Beltway) to Greensboro in the vicinity of the Piedmont Triad International Airport.  (SFEIS/FEIS, vol. 2 at fig. 1-6.)  In contrast to the Southern Loop, it has been the subject of further activity.  The project is included in the Winston-Salem Thoroughfare Plan/CTP, the Winston-Salem 2030 LRTP, the 2006-2012 STIP, and the Winston-Salem and Greensboro MTIPs.  In addition, the N.C. Board of Transportation identified the project as a "strategic corridor" in the Strategic Highway Corridor Vision Plan, the state's official map adopted by the N.C. Board of Transportation to identify corridors for long-term potential to serve passengers and freight movement.  (Leggett Decl. ¶ 15; Doc. 39, app. 19.)  Finally, the Northern Beltway is also being configured to accommodate a potential interchange with the Airport Connector, should the project ever materialize. Each of these potential indicators of foreseeability and/or proposed action will be considered.

Defendants provided the following responses to Plaintiffs' comments that the Airport Connector should have been considered in the SFEIS/FEIS:

69

The portion of the I-73/I-74 Connector (also known as the Airport Connector) from the Winston-Salem Northern Beltway to the Forsyth County/Guilford County line is estimated at $76 million in the Winston-Salem Urban Area 2030 Long Range Transportation Plan (LRTP), and is designated as a Turnpike Authority project. The $76 million would have to be provided by toll revenues since no state, Federal, or local funds have been identified for the project. The Turnpike Authority is not currently studying the I-73/I-74 Connector. It is not funded in the 2007-2013 TIP.[22] It is not a reasonably foreseeable project.

(ROD at 51.)

The project's inclusion in the Winston-Salem Thoroughfare Plan/CTP and Winston-Salem and Greensboro MPO LRTPs are not argued as strong indicators of foreseeability. These are essentially visionary documents and require no source of funding where a project is listed for illustrative purposes. N.C. Gen. Stat. § 136-66.2; 23 U.S.C. § 134(i)(2)(C). The same is true of the project's listing as a "strategic corridor," as that plan is not financially constrained. (Leggett Decl. ¶ 15.)

Plaintiffs point to a June 15, 2005, meeting of the North Carolina Turnpike Authority ("NCTA"), which voted to perform a preliminary study of the Airport Connector "for feasibility purposes" as a potential turnpike project. (Doc. 39, app. 7.) Plaintiffs note that the NCDOT Secretary presided over the NCTA meeting when the vote to study funding occurred. (Id.) In a

---

[22] The 2007-2013 TIP contains identical treatment of the Airport connector as its predecessor document relied on by Defendants in the SFEIS/FEIS.

letter subsequent to its vote, the NCTA requested that NCDOT's Program Development Branch include the Airport Connector in the draft STIP and set up funds "to conduct the toll feasibility study and the project development, environmental, and preliminary engineering studies." (Doc. 39, app. 8.) Both the Winston-Salem and Greensboro Transportation Advisory Committees of their respective MPOs adopted a resolution or wrote in support of the Airport Connector and funding for feasibility and environmental study. (Doc. 39, app. 10-11.) As of June 25, 2009, the Airport Connector "was included in the NCDOT's TIP in the event that toll funding was to become available." (Leggett Decl. ¶ 6.) As of July 1, 2009, however, no funding was allocated or authorized for the Airport Connector study in the TIP, nor have any TIP funds been spent on it. (Doc. 27, Ex. 2, Declaration of Steven D. Dewitt, P.E. ("Dewitt Decl."), ¶¶ 3-5.)

Plaintiffs argue that inclusion in the 2006-2012 STIP and in the Winston-Salem and Greensboro MTIPs indicates its foreseeability such that it should have been included in the SFEIS/FEIS. (Doc. 21 at 19.) As Federal Defendants note, however, the project was listed in the STIP as "Programmed for Planning and Environmental Study Only by the Turnpike Authority." (Doc. 39, app. 12; SFEIS/FEIS, vol. 1 at 1-22, 6-110.) This listing, they argue, "in no way leads to the conclusion that further development of the project would be

71

funded so as to make the Airport Connector reasonably
foreseeable." (Doc. 31 at 40.) Indeed, where, as here, state
law permits a listing in a STIP of a project beyond four years,
N.C. Gen. Stat. § 143B-350(f)(4), its listing (for this limited
purpose) is by regulation for illustrative or informational
purposes only. 23 U.S.C. § 135(g)(4)(F). Accordingly, FHWA is
not required to select any project, such as the Airport
Connector, from the illustrative list. 23 U.S.C.
§ 135(g)(4)(G)(i).

The Winston-Salem MTIP and the Greensboro MTIP also list
the Airport Connector as "programmed for planning and
environmental study only." (Doc. 39, app. 15, 17.) Here, too,
the listing as a project in an MTIP for this limited purpose,
thus meaning it is unfunded for construction and will not be
completed within the four-year planning period, renders it an
illustrative listing only. 23 U.S.C. § 134(j)(2)(B) & (D); 23
C.F.R. § 450.324(a). Thus, the Airport Connector is not listed
in the STIP or MTIPs as a financially constrained project.

Plaintiffs point further to several comments of Pat Ivey
("Ivey"), engineer for NCDOT, to argue that Defendants intend to
move forward with the project. For example, in a meeting with
the Town of Kernersville (which lies between the Northern
Beltway and the Piedmont Triad International Airport) Ivey
discussed the potential Airport Connector and commented that it

72

may be possible to address the project "as a supplement" to the SFEIS/FEIS if the Airport Connector were ever funded. (Doc. 39, app. 4.) Plaintiffs seize on the Kernersville meeting agenda that stated that "[a] future interchange location should be considered now as part of this Beltway EIS document." (Doc. 39, app. 5.) However, in 2005 Ivey is reported to have stated that "any additions or deletions at this point would cause significant delays" and urged that connectivity concerns be addressed in the future with a supplemental resolution. (Doc. 39, app. 6.) The court finds that none of these statements indicates that the project is imminent or constitutes a proposal.

Plaintiffs rely upon Western North Carolina Alliance v. N.C. Department of Transportation, 312 F. Supp. 2d 765 (E.D.N.C. 2008), to argue that NEPA requires consideration of the Airport Connector (and Southern Loop) despite the lack of funding. However, this case is readily distinguishable. In Western, the excluded projects were part of the same overall widening improvement project, which was being performed in phases. 312 F. Supp. 2d at 772. Here, the Northern Beltway and Airport Connector (and Southern Loop, for that matter) are each distinct projects at drastically different points in development and construction. Further, in Western the funding for the excluded projects had advanced through the development process, which is

73

not the case here.  <u>See</u> <u>id.</u> at 771.  As such, the court finds <u>Western</u> inapplicable.

The court finds that the listing of the Airport Connector in the various transportation plans does not make it reasonably foreseeable or rise to the level of a proposal for purposes of inclusion in the SFEIS/FEIS for the Northern Beltway.  The project has received no source of funding for construction in any plan in which it is listed.  Though a feasibility/environmental study has been approved for the project, it is not even currently funded.  Nor is the project listed in the Highway Trust Fund Act, N.C. Gen. Stat. § 136-180. Though it is listed in the Winston-Salem and Greensboro MTIPs and the STIP, its listing is by regulation for informational purposes only.  Thus, the Airport Connector has many hurdles to leap before the requisite agencies will be making any decision regarding its ultimate development.  As such, insufficient information exists as to its development that would permit decisionmakers to evaluate meaningfully its effects.  <u>See</u> 40 C.F.R. § 1508.23.

Finally, Plaintiffs point to the fact that an interchange of the Northern Beltway has been configured to accommodate the Airport Connector in the event it is ever approved and

74

constructed.[23]    (Doc. 21 at 20-21.)    The record reflects that

when authorizing the Northern Beltway, however, FHWA declined to

include an interchange because it concluded that the Airport

Connector was too speculative.   (SFEIS/FEIS, vol. 1 at 6-110.)

That the agency left spacing for an interchange should the

Airport Connector be funded and developed indicates merely smart

design to avoid unnecessary rework if funding is ever authorized

and the project materializes beyond the preliminary incubation

stage.  (Id.)

    The court cannot say that the Airport Connector is

sufficiently likely to occur such that Defendants should have

taken it into account in reaching their decision.   See Marsh,

976 F.2d at 767.   Rather, it remains speculative and contingent.

The court finds, therefore, that Defendants had no obligation to

include the Airport Connector in the Northern Beltway

SFEIS/FEIS.  As such, Plaintiff's motion for summary judgment on

this issue is denied and Defendants' motion is granted.

### 4.   Plaintiffs' "Preservation" of Challenge to the Order of Dismissal

    Finally, Plaintiffs seek in their reply brief to "preserve"

their challenge to the Order of Dismissal in case 1:99cv134 by

---

[23]   Some of the very newspaper articles to which Plaintiffs point also
indicate that the Airport Connector is years from fruition.   (See,
e.g., AR 24949 (noting that the Airport Connector "must undergo years
of studies examining issues such as its route, environmental concerns,
the amount of people who would use the road and whether tolls could
adequately pay for the project").)

adopting their arguments from their briefing therein (Doc. 127 (case 1:99cv134)). (Doc. 39 at 23-24.) As Defendants rightly pointed out at oral argument, Plaintiffs never raised these issues in their complaint in case 1:08cv570, and thus there is no argument to "preserve" in this case. To the extent Plaintiffs seek to raise in a reply brief arguments not addressed in their opening brief or raised by Defendants' response, the court would not consider such arguments on the grounds they were not fairly raised. Insofar as the court has already addressed (in the alternative) and rejected the merits of Plaintiffs' challenge earlier in this opinion, the matter is moot.

## III. CONCLUSION

For the foregoing reasons,

IT IS THEREFORE ORDERED as follows:

1.  In case 1:99cv134, Federal and State Defendants' joint motion to dissolve the injunctive provisions of the Order of Dismissal (Doc. 122) is GRANTED, and the action is DISMISSED with prejudice.

2.  In case 1:08cv570, Federal Defendants' motion to strike (Doc. 32) is DENIED. No genuine issue of material fact exists and judgment should be entered for Defendants as a matter of law. Therefore, Plaintiffs' motion for summary judgment (Doc. 19) is

DENIED, and Federal and State Defendants' cross-motions for summary judgment (Docs. 27 & 30) are GRANTED. Case 1:08cv570 shall be DISMISSED with prejudice.

A Judgment in accordance with this Order will be filed contemporaneously in each case.


                                                     /s/ Thomas D. Schroeder
                                               United States District Judge

May 19, 2010